UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RANDALL BUTTON,                              :
        Plaintiff,                        :
                                             :
        v.                                :     C.A. No. 11-563M
                                             :
MICHAEL J. ASTRUE,                           :
COMMISSIONER OF SOCIAL SECURITY,             :
        Defendant.                        :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

Plaintiff Randall Button ("Plaintiff") contends that he is disabled as a result of his multiple back surgeries, the partial replacement of his right knee and his anxiety and panic attacks. He seeks reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). Plaintiff's Motion contends that the decision of the administrative law judge ("ALJ") was infected by errors of law and not supported by substantial evidence. Defendant Michael J. Astrue ("Defendant") has filed a Motion for an order affirming the Commissioner's decision.

These Motions have been referred to me for Report and Recommendation. I find no error in the ALJ's determination that the opinions of several treating physicians that Plaintiff was incapable of substantial gainful activity are entitled to minimal evidentiary weight because they are inconsistent with treatment notes, with the conclusions of other treating physicians and with other substantial evidence in the record. I further find that the ALJ's findings with respect to

Plaintiff's credibility are sufficiently supported by substantial evidence.  Accordingly, I recommend that Plaintiff's Motion to Reverse or Remand Commissioner's Decision (ECF No. 9) be DENIED and that the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 10) be GRANTED.

## I.   **Background Facts**

Plaintiff Randall Button was born in 1962 and was forty-five at the time of his original alleged onset of disability on February 16, 2008, and at the time of amended onset on April 1, 2008.  Tr. 29, 35.  He has a high school diploma and, for most of his working life, was a machine operator/foreman and a customer service representative at a hardware store.  Tr. 29, 166-67.  From 1993 through 2007 (except 2001 when he had no income), he had employment constituting substantial gainful activity[1] in every year except 2000 and 2005 when he earned between $6000 and $7000; for six of those years (1993-1998), his income from employment exceeded $30,000 per year.  Tr. 148.  He left his last job in April 2008 due to a "nervous breakdown at work" attributed in part to not getting a higher position, Tr. 27, 42, 253, and also because he "had to have another surgery," Tr. 35.  He lives alone in an apartment with assistance from his sister, attends to his personal care, has a license, prepares simple meals, uses a computer, handles finances and socializes with family and friends.  Tr. 27, 34-36.  During the period of alleged disability, the record indicates that he traveled to Texas and enjoyed hunting, fishing and archery.  Tr. 278, 530, 582, 584.  A life-long alcoholic who has maintained sobriety since sometime in 2004 or 2005, his relevant diagnoses include foot drop, degenerative disc disease, depression, anxiety, panic disorder, four back surgeries and knee replacement surgeries.  Tr. 130-42, 162-75, 259, 278.

---

[1] The amount of income from employment sufficient to constitute "substantial gainful activity" changes each year. A description of where to find the amount for each year is laid out in C. Kubitschek & J. Dubin, Social Security Disability: Law and Procedure in Federal Court §§3:6-3:7 (2013 ed.).

A.      **Physical Impairments – Back and Right Knee**

Mr. Button's medical difficulties with his back and right knee are longstanding: the

records reflect knee surgery in 1987 and physical therapy for back issues in 1994.  Tr. 395-401.

The history of back trouble directly pertinent to this application began in 2000, when

Plaintiff underwent the first of four surgeries[2] to address herniated discs; the last was in

November 2006, when Plaintiff's spine was partially fused.  Tr. 227-28, 236, 389, 496.  The

2000 surgery was performed by Dr. David Burns while the others were performed by Dr. Curtis

Doberstein.  Id.  With the exception of 2001, throughout this period, he was working.  Tr. 144-

58.

Plaintiff appears to have recovered well from his last back surgery.  Physical therapy

notes set out a positive prognosis: "[e]xcellent rehab potential to reach and maintain prior level

of function."  Tr. 496.  In February 2007, Plaintiff reported that the pain was moderate and

rapidly getting better and that it limited only his "more energetic interests."  Tr. 493.  By mid-

February 2007, he was back to work, put in a ten-hour day and "feels pretty good."  Tr. 505.  By

the end of February 2007, Dr. Doberstein noted no pain associated with activities of daily living

and only mild pain associated with work and recreational activities.  Tr. 510.  In July and August

2007, Plaintiff had a second set of physical therapy sessions due to a lumbar sprain.  Tr. 514.

His progress was "good," his tolerance of both work and daily living activities and his range of

motion all improved.  Tr. 517-21.

After 2007, the record reflects many subjective complaints about back pain.  Tr. 383,

578, 581.  However, by the time of alleged onset of disability in April 2008 and continuing

throughout the period of alleged disability, treatment notes largely reflect that Plaintiff's back

---

[2] The records for the 2006 surgery are missing.  However, Plaintiff testified that he has had surgery on his back four times and there is a reference in 2007 physical therapy notes to back surgery on November 13, 2006.  Tr. 44, 496.

had stabilized.  For example, his primary care physician, Dr. McNiece, wrote on October 16,

2009, "[back pain] remains under good control" and on December 18, 2009, "back has been

stable."  Tr. 582.  On a neurosurgical follow-up with his back surgeon, Dr. Doberstein, in

January 2011, he complained of right thigh pain, persistent weakness in his right foot and ankle

and the inability to stand or walk for any period of time, but reported no "significant back pain."

Tr. 587.  Dr. Doberstein observed that his gait was normal and his strength was "5 out of 5 in all

muscle groups except" the right leg, as to which he observed "4/5" for two muscle groups.  Id.

From a chronological perspective, Plaintiff's right knee difficulties are more directly

related to his disability claim.  The first reference is in April 2008, at the office of Dr. Burns,

who had done the first back surgery.  Tr. 321.  On May 8, 2008, Dr. Burns performed

arthroscopic surgery on the right knee, Tr. 268-69, which surgery was one of the triggers for the

alleged onset of disability in April 2008.  Tr. 35.  Afterwards, Plaintiff was sent for physical

therapy and by June 2008, he reported that his knee "fe[lt] much better;" he failed to complete

physical therapy, as a result of which he was discharged.  Tr. 529.  Relatedly, Dr. Burns's

treatment notes reflect serious concerns about Plaintiff's non-compliance with treatment to

facilitate recovery from right knee surgery.  Tr. 313, 314, 318.

Plaintiff's knee issues resurfaced as a result of a fall in February 2009.  Tr. 313.  On

March 18, 2009, Dr. Burns operated again, this time a partial knee replacement.  Tr. 326-27.  Dr.

Burns's notes reflect that his choice of treatment was affected by Plaintiff's noncompliance

following the prior surgery.  Tr. 314.  Post-surgery, Dr. Burns observed that the prosthesis

showed "overall satisfactory position and alignment;" Plaintiff went back physical therapy.  Tr.

311, 533-34.  Shortly after this surgery, Dr. Burns opined that he expected Plaintiff to be able to

return to work: "[h]e is unable to work and I do anticipate that he will be out of work for 6 to 12

months." Tr. 384.  Plaintiff made good progress.  Notes from his last physical therapy session in

June 2009 indicate that "he is doing well," he had only mild pain and good range of motion and

his ambulation had improved to the prior level of functioning.  Tr. 546-47, 549.  The last time

Dr. Burns saw Plaintiff for treatment, on July 28, 2009, his note indicates "[t]he knee is without

effusion or increased warmth.  Range of motion is actually very good . . . .  If he has any further

complaints, he will contact me."  Tr. 383.  The records do not reflect that Dr. Burns ever saw him

for treatment again.

### B.      Mental Impairments – Anxiety and Panic Attacks

Though long standing, Plaintiff's mental health concerns seem to have peaked at

approximately the same time he stopped working in April of 2008; in his testimony, he said that

a "nervous breakdown at work" was a reason why he stopped working (in addition to the knee

diagnosis in the same month).  Tr. 35, 42.

Plaintiff's panic attacks are linked to his history of alcoholism over a twenty-year period,

which ended with sobriety that started at the latest by 2005.  Tr. 278.  In November 2007,

Plaintiff began treating with psychiatrist, Dr. Alexander Scagnelli, who diagnosed "Panic

Disorder, Anxiety Disorder, NOS, [and] Alcohol Dependence Full Remission."  Tr. 440.  At

intake, Plaintiff told Dr. Scagnelli, "'I've been getting Panic Attacks and Anxiety.' (X 2

months)."  Tr. 436.  He reported that his daily activities included "fishing/hunting/archery" and

that his overall mood was "not too bad."  Tr. 436-39.  Dr. Scagnelli noted that Plaintiff displayed

"fine" judgment.  Tr. 439.

Plaintiff's mental status became significantly worse in February 8, 2008, when he was

hospitalized at Butler Hospital for anxiety and depression, which he associated with "diff at work

especially since he was not . . . given a higher position . . . his mother is in a nursing home,  . . .

panic attachs [sic] and has diff driving . . . has inc anger towards a neighbor . . . being on a diet with 60lb wt loss x 6-7 mos." Tr. 259-65.  His initial psychiatric examination at Butler yielded a GAF score of 43, Tr. 264, which had improved to 51 by the time he was discharged a week later.[3]  Tr. 255.  His discharge summary indicates that his GAF score in the past year had been as high as 65.  Tr. 250-55.  By March 2008, in therapy with Dr. Kristin Maki, he reported depression from being out of work – Dr. Maki set a therapeutic plan for Plaintiff to begin a search for employment.  Tr. 283.  This plan was delayed by the April 2008 knee injury, but by May 2008, Plaintiff's therapy goal of returning to work was back on track: "[he] has made progress in searching for jobs."  Tr. 284-85.  Plaintiff stopped therapy with Dr. Maki in late June 2008 and never followed through on the therapy plan of "[j]ob search goals."  Tr. 286.

Plaintiff continued to see his psychiatrist, Dr. Scagnelli, regularly.  Tr. 358-64, 550-77.  Dr. Scagnelli monitored the frequency of panic attacks and prescribed medications to manage his mental health issues.  Id.  As a result, by May 2009, his primary care physician, Dr. McNiece, found Plaintiff to be calm, engaging, and in a good mood, Tr. 579, and in June 2009, noted that his mood was "stable!"  Tr. 580.  In October 2009, he told Dr. McNiece about a fall from a tree while hunting, one of his preferred recreation activities.  Tr. 582.  By 2010 through March 2011, Dr. Scagnelli's notes indicate that panic attacks had become infrequent.  Compare Tr. 563, 567, 569, 570, 571, 573, 574, 576, 577 ("no PAs"), with Tr. 564, 565 566, 572 (reporting one or more panic attacks).  This was confirmed in February 2010, by Dr. McNiece, who reported that Plaintiff was taking a medication that "seem[ed] to be working well for his panic disorder."  Tr. 583.  Confirming the extent of his recovery from various issues, in June 2010, he told Dr.

---

[3] A GAF score of 41 to 50 indicates "serious symptoms," while one between 51 and 60 indicates moderate symptoms and one over 60 indicates "some mild symptoms . . . but generally functioning pretty well, has some meaningful relationships."  Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision 32-34 (4th ed. 2000) ("DSM-IV-TR")

McNiece about a trip to Texas and that he was "feeling well;" in September 2010, he reported

feeling "the best he has in some time."  Tr. 584.

C.       **Social Security Application and Treating Physician Assessments**

Plaintiff's Social Security application was initiated during the period following his March

2009 knee surgery.  Tr. 19.  Much of the information in the application about his pain, daily

living activities and other functions was provided in an interview and on forms completed in

April 2009, early in the course of his recovery from that surgery, the same month when Dr.

Burns opined that he would be out of work for at least six and possibly as long as twelve months

as a result of that surgery.  Tr. 130-42, 162-78, 188-95, 384.  In addition to providing this

information, Plaintiff asked several of his treating physicians to fill in evaluation forms to

support his Social Security application.

The first one is a physical capacity evaluation and pain questionnaire filled out on

September 29, 2009, by Dr. Burns, who opined that Plaintiff could not sit, stand or walk for any

length of time, could not lift even five pounds and could not use his arms or hands for any task,

that Plaintiff suffered from moderate pain and that he would be absent from work four days per

month as a result of his impairments.  Tr. 385-86.  This opinion was written two months after

Plaintiff's last treatment with Dr. Burns on July 28, 2009, at which appointment the notes

indicate that the knee was doing well, and that Dr. Burns told Plaintiff to contact him if he had

"any further complaints."  Tr. 383.  Almost two years later, without treating Plaintiff at all in the

interim period, on April 22, 2011, Dr. Burns completed another physical capacity evaluation

with supplemental questions.  Tr. 594-95.  This time, with no explanation for the basis for the

alteration in his opinion from 2009, Dr. Burns opined that Plaintiff was limited to sitting for one

hour and standing for one hour within an eight-hour workday, that he could occasionally lift or

carry six to ten pounds, that he could not use his arms or hands for reaching, pushing or pulling, that he could not bend or squat, that his impairments would last at least twelve months and that he would need unscheduled breaks and shifts of position throughout the work day.  Tr. 594-95.

Also in April 2011, Dr. McNiece filled in a pain questionnaire in support of Plaintiff's application, in which he opined that Plaintiff's pain from a swollen hand,[4] from "motion" and from decreased spine flexibility would affect his ability to pay attention and would interfere with his ability to perform even sedentary work.  Tr. 593.  Based entirely on Plaintiff's subjective complaints, the form contrasts markedly with many of Dr. McNiece's treatment notes for 2010 and 2011, which reflect that Plaintiff had climbed a tree while hunting in late 2009 and traveled to Texas in 2010 and do not mention that pain interfered with either activity.  Tr. 582, 584-85. Dr. McNiece did not administer any tests to assess Plaintiff's ability to pay attention or concentrate, nor are attention issues referenced in any of his treatment notes.

The last treating physician evaluation is a mental residual functional capacity ("RFC")[5] assessment, with supplemental questions, filled in by Dr. Scagnelli on April 20, 2011.  Tr. 588-92.  The conclusions on the form are unsupported by any clinical testing in the record, in contrast to Dr. Scagnelli's own notes, which indicate concrete improvement in 2010 into 2011, and are inconsistent with Dr. Maki's recommendation that employment would be therapeutically beneficial for Plaintiff, with Dr. McNiece's notes about Plaintiff's functioning and with Plaintiff's history and description of his daily activities.  Specifically, the box-checked portion of the assessment indicates that since April 2009 Plaintiff had been "markedly limited" in

---

[4] The swollen hand is from a scratch first mentioned to Dr. McNiece on March 8, 2011.  Tr. 585.  Although the swelling had declined, it was still causing pain at Plaintiff's next appointment, which was also his last appointment before Dr. McNiece completed the form on March 23, 2011.  Tr. 586.  The swollen hand has no relationship to this application.

[5] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

understanding, remembering and carrying out detailed instructions; maintaining concentration; sustaining an ordinary routine without special supervision; completing a normal workday or workweek without interruptions; accepting instructions and criticism from supervisors; getting along with coworkers; adhering to basic standards of neatness and cleanliness; and responding appropriately to changes in the work setting. Tr. 588-89. The form also indicates that Plaintiff has been "severely limited" in his ability to relate to others, to carry out functions of daily living and to respond to coworkers and work pressures. Tr. 591. In his textual comments, Dr. Scagnelli wrote that Plaintiff "would have difficulty in a work situation, secondary to cognitive problems, as well as a difficulty interacting with peers and supervisors due to irritability. He has a history of having a short fuse and can be explosive." Tr. 590. The form concludes that Plaintiff "**<u>cannot sustain</u>** competitive employment on a full-time, ongoing basis." Tr. 592? (emphasis in original).

## II.     <u>Travel of the Case</u>

On March 19, 2009, a protective filing date, Plaintiff applied for DIB and SSI, alleging that he had been disabled since April 1, 2008, due to drop foot, degenerative disc disease, depression, anxiety, panic disorder, five back surgeries and knee replacement surgeries.[6] Tr. 19, 35, 130-42, 162-75. Plaintiff's claim was referred by the Commissioner to state agency physicians for physical assessment and to state agency psychologists for mental assessment.

Dr. Joseph Callaghan reviewed the entire record and prepared a physical RFC assessment on June 8, 2009, which concluded that Plaintiff could stand for at least two hours and sit for about six hours of an eight-hour day, could occasionally lift or carry twenty pounds and

---

[6] The original onset date claimed in the application was February 16, 2008, which was amended at the administrative hearing to April 1, 2008. Tr. 35. The original application also alleged disability due to high cholesterol, shoulder pain and obesity; these were rejected by the ALJ and Plaintiff does not contest these findings. Tr. 22; ECF No. 9 at 3.

frequently lift or carry ten pounds, and could occasionally balance, stoop, kneel, crouch, crawl and climb stairs and ramps, but could never climb ladders, ropes or scaffolds.  Tr. 350-57.  In October 2009, Dr. Purins, a reviewing physician, opined that Dr. Burns's treatment notes demonstrated continued improvement from knee surgery, with good range of motion and no indications of complications.  Tr. 387.  His opinion also responds to Dr. Burns's September 2009 evaluation: "Burns, DO comment re: disability is without detail and not supported by findings." Id.  Dr. Purins affirmed Dr. Callaghan's June 2009 opinion.  Id.

On July 23, 2009, Dr. Clifford Gordon, an agency psychologist, reviewed the record and prepared a mental RFC assessment concluding that Plaintiff's mental impairments did not significantly limit most functions and only moderately limited certain functions; he references reliance upon Plaintiff's medical record, observation of his lack of difficulty with understanding and concentration at his application interview, his positive work history, high school education, ability to live independently, use of a computer and management of his finances and lack of problems with family, friends, neighbors and authority figures.  Tr. 365-82.  In November 2009, Dr. MaryAnn A. Paxson, a reviewing psychologist, affirmed Dr. Gordon's July 2009 opinion noting that there were no new allegations or allegations of worsening since July 2009.  Tr. 388.

After Plaintiff's claims were denied both initially and upon reconsideration, he requested an administrative hearing.  Tr. 63-72.  On April 19, 2011, ALJ Randy Riley conducted a hearing at which he heard testimony from Plaintiff (represented by counsel), a vocational expert and a medical expert.  Tr. 31-60.  In a written decision dated April 29, 2011, the ALJ found that Plaintiff was not disabled under the Act.  Tr. 19-30.  On September 21, 2011, the Appeals Council denied Plaintiff's request for review.  Tr. 1-4.  Plaintiff, having exhausted his

administrative appeals, now appeals the ALJ's decision as the Commissioner's "final decision." 42 U.S.C. § 405(g).

**III.** **The ALJ's Hearing and Decision**

Most of Plaintiff's testimony focused on his daily living activities and medical difficulties. Tr. 34-43. The ALJ asked him about his use of a cane, which had not been prescribed by any treating source. He said he did not need it, but used it almost all the time to prevent falls. Tr. 39-40. He testified that he napped for two to three hours per day due to depression and anxiety, that he suffered from one to two panic attacks per week, during which he typically threw up, and that he "occasionally" had problems with memory and concentration. Tr. 38-43.

Medical expert Stephen Kaplan, M.D., was called to testify by the ALJ. Tr. 43. After discussing Plaintiff's medical history, he gave his opinion that Plaintiff was limited to sedentary work, that some back pain would be consistent with the back surgeries he had undergone but there was no evidence to support the claim that he could only sit for a brief period. Tr. 47-48. Dr. Kaplan also observed that Plaintiff's use of a cane at the hearing was inconsistent with Dr. Doberstein's observation that his gait was normal.[7] Id. Vocational expert Edmond J. Calandra also testified. Tr. 49-51. Responding to hypotheticals posed by the ALJ, he found that the Plaintiff could not perform his past work, but could work at the sedentary unskilled level. Tr. 50. He testified that the number of jobs would be reduced by 25% with a "sit-stand option." Tr. 50-51. An impairment creating the need for more breaks than normal would preclude employment. Id.

In his decision, the ALJ first found that Plaintiff met the insured requirements of the Act through March 31, 2013. Tr. 21. He then proceeded through the familiar five-step inquiry to

---

[7] Notwithstanding this testimony, the ALJ included the use of a cane in his hypothetical. Tr. 50.

determine the merits of Plaintiff's claim.  After concluding that Plaintiff was not engaged in

substantial gainful activity at Step One, he proceeded to Step Two, finding the following severe

impairments: back impairment, right knee impairment, anxiety and depression.  Tr. 22.

At Step Three, the ALJ found that none of Plaintiff's impairments meet the criteria of any

listed impairment based on the absence of any treating or examining physician who mentioned

such findings and the testimony of Dr. Kaplan.  Tr. 23, 47.  With respect to Plaintiff's mental

impairments, after consideration of the Listings related to 12.04 (Affective Disorders) and 12.06

(Anxiety Related Disorders), the ALJ determined that Plaintiff did not meet or medically equal

any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id.  In

making this determination, he relied not only on the record, but also on Plaintiff's testimony

regarding mild restrictions in daily living and social functioning and moderate difficulties with

concentration, persistence and pace.  Tr. 23.

The ALJ determined Plaintiff's RFC at Step Four.  Tr. 24.  In making this determination,

he focused carefully on Plaintiff's medical history, prior work and daily living activities and

afforded Dr. Kaplan's testimony and the assessments of the state agency physicians and

psychologists substantial evidentiary weight; he found that Plaintiff is not as impaired as alleged.

Tr. 25.  After reviewing all of the evidence, the ALJ concluded that, while his medically

determinable impairments could reasonably be expected to cause the alleged symptoms, his

statements concerning intensity, persistence and limiting effects of the symptoms were not

credible to the extent that they were inconsistent with the RFC.  Tr. 26.  The ALJ afforded the

pain questionnaire completed by Dr. McNiece minimal evidentiary weight because it seemed to

be based principally on Plaintiff's subjective reports of his symptoms and limitations, the

reliability of which the ALJ considered questionable.  Tr. 27.  He similarly discounted the

assessment forms filled in by Dr. Burns and Dr. Scagnelli as inconsistent with treatment notes, the record as a whole and Plaintiff's own testimony.  Tr. 28.  After a thorough survey of the record, the ALJ concluded that Plaintiff could perform sedentary work as defined by 20 C.F.R. §§ 404.1567(a), 416.967(a), with the following limitations:

> [H]e can never use foot control operations, can occasionally climb stairs, balance, stoop, kneel, crouch and crawl but never climb ladders.  He would be limited to jobs that can be accomplished using a cane.  He must avoid concentrated exposure to fumes, odors, gases, poor ventilation and hazards such as dangerous machinery and unprotected heights.  His work would be limited to simple routine, repetitive tasks.

Tr. 24.  Based on this RFC and the testimony from the vocational expert, the ALJ concluded that, while Plaintiff is not capable of performing his past relevant work as a CNC operator, a sales clerk and a general machine operator, he is not disabled because he can perform jobs existing in significant numbers in the regional and national economies.  Tr. 29-30.

**IV.**   **Issues Presented**

Plaintiff presents two arguments, which he contends establish that the decision of the Commissioner that he is not disabled within the meaning of the Act is not supported by substantial evidence in the record and is infected by legal error:

1. The ALJ erroneously discounted the treating source opinions of Plaintiff's knee surgeon, primary care physician and psychiatrist.

2. The ALJ's assessment of Plaintiff's credibility was not supported by substantial evidence.

**V.**   **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Irlanda

Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. §§ 404.1529(a), 416.929(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

A Sentence Six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)). Essential to the materiality requirement is that the new evidence relate to the time period for which benefits were denied; evidence reflecting a later-acquired disability or the subsequent deterioration of a previous non-disabling condition is not material. Gullon ex rel. N.A.P.P. v. Astrue, No. 11-099ML, 2011 WL 6748498, at *10 (D.R.I. Nov. 30, 2011) (quoting Beliveau ex rel. Beliveau v. Apfel, 154 F. Supp. 2d 89, 95 (D. Mass. 2001) ("To be material, the evidence must be both relevant to the claimant's condition during the time period for which benefits were denied and probative.")). The plaintiff bears the burden of demonstrating that a piece of new evidence is material. See Evangelista, 826 F.2d at 139.

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)). The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. Id.

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. §§ 404.1505, 416.905. The

impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511, 416.905-911.

### A.   Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. §§ 404.1527(c), 416.927(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the

medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R §§ 404.1527(c), 416.927(c).  A treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. §§ 404.1527(d), 416.927(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545-1546, 416.945-946), or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.    The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. §§ 404.1520(c), 416.920(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Parts 404 and 416, Appendix 1, the claimant is disabled.  Id. §§ 404.1520(d),

920(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. §§ 404.1520(e)-(f); 416.920(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. §§ 404.1520(g), 416.920(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

## C.    Capacity to Perform Other Work

Once the ALJ finds that a claimant cannot return to the prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the local or national economy.  Seavey, 276 F.3d at 5.  To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v.

Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id. (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given RFC or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991).  It is only when the claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given RFC indicated by the exertional limitations.  Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

### D.    Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting record evidence.  See Frustaglia, 829 F.2d at 195.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

**E.      Pain**

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> 4. Treatment, other than medication, for relief of pain;

5. Functional restrictions; and

6. The claimant's daily activities.

Avery, 797 F.2d at 29; Gullon v. Astrue, No. 11-cv-099ML, 2011 WL 6748498, *5-6 (D.R.I.

2011).  An individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. §

423(d)(5)(A).  Guidance in assessing the credibility of the claimant's statement is provided by

the Commissioner's 1996 ruling.  SSR 96-7p, 1996 WL 374186 (July 2, 1996).  Credibility of an

individual's statement about pain or other symptoms and their functional effects is the degree to

which the statement can be believed and accepted as true; in making this determination, the ALJ

must consider the entire case record and may find that all, only some, or none of an individual's

allegations are credible.  Id. at *4.  One indication of the credibility of an individual's statements

is their consistency, both internally and with other information in the record.  Id. at *5-6.

**VII.**   **Application and Analysis**

   **A.**   **ALJ's Decision to Give Minimal Weight to Treating Source Opinions of
         Knee Surgeon, Primary Care Physician and Psychiatrist**

In this case, the ALJ faced the challenge of evaluating what weight to give four

assessment forms specially prepared for this application by three treating sources, each of which

conflicts with the physician's own treatment notes, other credible medical evidence and much of

the record information about Plaintiff's pain, daily living and prior work activities and ability to

function.  This determination regarding the weight to give treating physician opinions is

governed by 20 C.F.R. §§ 404.1527(c), 416.927(c).  See generally Morales v. Comm'r of Soc.

Sec., 2 F. App'x. 34, 36 (1st Cir. 2001) (ALJ had legally sufficient basis to discount treating

physician's opinion that was not corroborated by clinical findings and was refuted by the rest of

the record evidence).  A treating physician's report may be discounted if it is conclusory, not

based on clinical testing or is inconsistent with other substantial evidence in the record.  Konuch,

at *4-5.  In reviewing the ALJ's determination, this Court's role is limited: if the ALJ's approach

is supported by substantial evidence, the permissibility of alternative interpretations is beside the

point – it is not for this Court to reweigh the evidence or substitute its judgment for that of the

ALJ.  Amaral v. Comm'r of Soc. Sec., 797 F. Supp. 2d 154, 162-63 (D. Mass. 2010).

     The first of the three treating physicians was Dr. Burns, who submitted two box-checked,

fill-in-the-blank forms assessing Plaintiff's physical capacity, one in September 29, 2009, and

the second immediately after the administrative hearing on April 22, 2011.  Tr. 385-86, 594-95.

There are serious concerns with these forms, which collectively well justify the ALJ's decision

to afford them minimal weight because "the evidence does not support such a restrictive

assessment and is internally inconsistent with his treatment notes."  Tr. 28.  This despite the fact

that there can be little doubt that Dr. Burns qualifies as a treating source with a longstanding

relationship with Plaintiff.  He saw Plaintiff for back pain, performing the 2000 back surgery,

from 1994 until Dr. Doberstein took over in 2001, and performed both surgeries on Plaintiff's

right knee.  Tr. 305-07, 311-29, 383-84, 389-93, 397-428.

     The first of Dr. Burns's two forms, filled out in 2009, describes Plaintiff as essentially

bedridden, unable to sit, stand or walk for any length of time.  Tr. 385-86.  The form was

completed two months after Dr. Burns's last appointment with Plaintiff, at which he opined that

the right knee was doing well; his instructions to Plaintiff were to contact him if he had "any

further complaints."  Tr. 383.  Even more significantly, the form was written five months after

Dr. Burns himself opined that Plaintiff would be able to return to work in six to twelve months,[8]

---

[8] Dr. Burns's opinion that Plaintiff would be able to return to work within at most twelve months establishes that the condition of Plaintiff's right knee may have been temporarily disabling in the aftermath of the second surgery, but was not a disability under the Act, which is defined as a severe impairment that persists for a continuous period of not less than twelve months.  20 C.F.R. §§ 404.1509, 416.909; see Ribeiro v. Barnhart, 149 F. App'x 7 at *8 (1st Cir. 2005) (claimant must show mental condition prevented her from working for at least twelve months); Menezes v. Apfel, No. CIV. 99-168-B, 2000 WL 1499491, at *6-7 (D.N.H. May 4, 2000) (plaintiff recovered from each of multiple ankle and back surgeries; claim denied for failure to meet duration requirement).  Plaintiff correctly does

and there are no intervening notes to indicate any change of condition.  See Tr. 384.  During the

months preceding the completion of the form, Plaintiff completed physical therapy;

contemporaneous notes indicate, "he is doing well," with mild pain, good range of motion and

ambulation improved to the prior level of functioning.  Tr. 546-47, 549.  One month later,

Plaintiff told Dr. McNiece about a mishap while hunting.  Tr. 582.  When Dr. Burns's first box-

checked assessment is read in the light of the contemporaneous record, the ALJ's determination

to give it minimal weight is plainly justified.  Arroyo v. Sec'y of Health & Human Servs., 932

F.2d 82, 89 (1st Cir. 1991) (box-checked form may be rejected where it is contradicted by

competent medical evidence); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Dr. Burns's second assessment is even more puzzling.  Signed three days after the

hearing – the ALJ held the record open to receive it and two others – it is inexplicably different

from the first, despite the fact that the record does not indicate that Dr. Burns treated Plaintiff in

the intervening year and a half.  Tr. 51, 594-95.  With no explanation for the basis for his

opinion, why it differs from the opinion on the form prepared on September 29, 2009, and why it

differs from his own treatment notes of April and June 2009, he checked boxes and circled

answers indicating that Plaintiff can neither sit nor stand for more than an hour during an eight-

hour workday and that these limitations can be expected to last at least twelve months.  Tr. 594-

95.  The ALJ's finding that it too is entitled to minimal weight is well supported by substantial

evidence.

The second treating physician to complete a form right after the hearing is Plaintiff's

primary care doctor, Dr. McNiece.  Tr. 593.  Prepared on April 21, 2011, this box-checked form

deals with pain and opines that Plaintiff would experience pain from every function listed on the

---

not attempt to combine any of his unrelated impairments in order to meet this basic durational requirement.  20
C.F.R. §§ 404.1522, 416.922 (stacking of unrelated severe impairments not permitted).

form (including sitting and standing), except walking.  It concludes that Plaintiff's pain would interfere with his concentration and ability to complete a full work week at even a sedentary level.  Id.  The responses on the form contrast markedly with some of Dr. McNiece's treatment notes for the period preceding the completion of the form: "feeling reasonably well," from March 8, 2011; "feeling best he has in some time," from September 14, 2010.  Tr. 584-85.  The only reference in Dr. McNiece's notes to pain requiring his attention was from the scratch on Plaintiff's hand.  Tr. 585.  Dr. McNiece's reference to back pain contrasts with what Plaintiff told his back surgeon, Dr. Doberstein, in January 2011: "[h]e denies significant back pain."  Tr. 587.  The sole source of Dr. McNiece's conclusion about pain is Plaintiff's subjective reports; for example, there is no evidence that he ever tested Plaintiff to assess his concentration levels.  In short, the ALJ's conclusion that Dr. McNiece's form was the result of uncritically accepting as true Plaintiff's subjective complaints and should be afforded minimal weight is well supported.  See Rodriguez Pagan, 819 F.2d at 3 (treating physician's opinion not entitled to controlling weight when it relies excessively on claimant's subjective complaints rather than objective medical findings).

The last of the three treating physicians to prepare a post-hearing assessment submitted the meatiest form – Dr. Scagnelli served continuously as Plaintiff's psychiatrist beginning in 2007 and the form he completed is somewhat more than a box-checked form prepared in apparent haste as were those of Drs. Burns and McNiece.  Tr. 436, 588-92.  Nevertheless, it expresses opinions, including that Plaintiff has marked limitations in understanding, concentration and his ability to interact with supervisors, that are materially different from his own treatment notes; inconsistent with the plan of treating psychologist Dr. Maki that Plaintiff's mental health would benefit from work; inconsistent with Plaintiff's testimony that he had only

occasional difficulty with attention and concentration; and totally different from the conclusions of the medical expert Dr. Kaplan and the mental health consultants, Drs. Gordon and Paxson, who reviewed the entire record including the references to Plaintiff's prior work experience, his daily living activities and overall ability to function.  These reasons justify the ALJ's decision to give it minimal evidentiary weight.  Tr. 28.

The record certainly confirms the ALJ's finding that Plaintiff's anxiety and depression were severe impairments, so severe that Plaintiff had a psychiatric episode in February 2008 for which he was hospitalized for a week at Butler Hospital.  Tr. 259-65.  However, by the time he was discharged from the hospital, his GAF score had risen to 51, which indicates moderate symptoms.  DSM-IV-TR at 34.  Also significant is the assessment that during the year prior to his hospitalization, he had a GAF score of 65, which indicates "mild symptoms . . . functioning pretty well."  Id.  After this hospitalization, with his therapist, Dr. Maki, Plaintiff reported feeling "relaxed and able to let minor frustrations 'roll [off his] back.'"  Tr. 284.  During the sessions with Dr. Maki, Plaintiff attributed his depression to that fact that he was not working; far from concluding that he was incapable of work, Dr. Maki advised him to try to secure employment.  Tr. 283-86.  Notably inconsistent with Dr. Scagnelli's opinion was Dr. Maki's note of April 29, 2008, in which she records, "Mood is having a mild impact on household functioning and relationships."  Tr. 284.  To Dr. McNiece, Plaintiff reported minimal anxiety during 2010 and 2011, except when his medication was being adjusted.  Tr. 583-86.

The record contains no clinical findings or other evidence to support the conclusion implicit in Dr. Scagnelli's opinion that there must have been a radical decline in Plaintiff's understanding and concentration ("cognitive problems").  See Tr. 590.  Despite his anxiety and panic attacks in the period until April 2008, Plaintiff had a job requiring technical skills and

26

knowledge, use of machines and supervision of ten people; he was a "lead worker." Tr. 167-68.

Yet Dr. Scagnelli describes someone barely able to understand, remember and carry out detailed

instructions, markedly limited even in "basic standards of neatness and cleanliness" and severely

limited in his ability to get along with others. Tr. 588-89, 591.  Plaintiff himself undermines

some of Dr. Scagnelli's opinion: his application responses indicate that he socialized with other

people two to three times a week and that he got along well with authority figures like bosses,

while he testified that he had only occasional difficulty with attention and concentration.  Tr. 28,

192, 194; see also Tr. 278 (friendship network is "good – all live locally").  And Dr. Scagnelli's

treatment notes, while hard to decipher, appear to record a steady reduction of symptoms like

panic attacks and vomiting, none of which is reflected in his April 2011 opinion.  See Tr. 550-77.

     Dr. Scagnelli's opinion closes with his view that Plaintiff cannot sustain full-time

ongoing employment.  Tr. 592.  Apart from the inconsistency of this conclusion with other

substantial evidence, this opinion regards an issue reserved to the Commissioner that can never

be afforded controlling weight. 20 C.F.R. §§ 404.1527(e), 416.927(e); Arroyo, 932 F.2d at 89

(finding ALJ not required to accept conclusions of claimant's treating physicians on ultimate

issue of disability); Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982) (finding physician's

conclusions with respect to the ultimate question of disability not binding on hearing examiner).

Therefore, the ALJ was correct to afford it minimal weight.  Keating, 848 F.2d at 276 ("treating

physician's conclusions regarding total disability may be rejected by the Secretary especially

when, as here, contradictory medical advisor evidence appears in the record").

     The ALJ's evaluation of Dr. Scagnelli's April 2011 opinion is supported by the

substantial evidence in the record.  It was not error to afford it minimal evidentiary weight.

###### B.     ALJ's Assessment of Plaintiff's Credibility

In order to establish a claim of disability due to pain or other subjective symptoms, a claimant must first show that he has medically-determinable impairments that can reasonably be expected to cause the allegedly disabling symptoms.   Assuming a claimant meets this burden, the ALJ must then consider the intensity and persistence of the claimant's symptoms and the functional impact of those symptoms on his ability to work by evaluating the credibility of the claimant's subjective descriptions, among other factors.   20 C.F.R. §§ 404.1529(a), 416.929(a). The First Circuit recognizes that it is the province of the Commissioner, not the reviewing court, to assess the credibility of all witnesses, including the claimant.   Irlanda Ortiz, 955 F.2d at 769. This Court should not disturb a clearly-articulated credibility finding that is consistent with substantial supporting evidence in the record.   Frustaglia, 829 F.2d at 195.

The ALJ here concluded that Plaintiff's medically determinable impairments could be expected to cause the claimed symptoms, but that his statements concerning intensity, persistence and limiting effects were not credible to the extent that they were inconsistent with the ALJ's RFC.   Tr. 25-26.   In drawing this conclusion about Plaintiff's credibility, the ALJ specifically considered his testimony and subjective complaints contrasted with other evidence in the record, including the objective medical evidence in light of the factors mandated by 20 C.F.R. §§ 404.1529(a) and 416.929(a) and SSR 96-7p, as well as the evidence of work history, daily activities, functional restrictions and frequency and intensity of pain.   Tr. 25-29.   For example, Plaintiff's complaint that he cannot stand for more than twenty minutes, Tr. 36, is inconsistent with references in the record to hunting, Tr. 278, 582, as well as with Dr. Doberstein's conclusion that he had strength of 4/5 or 5/5 in all muscle groups and that his "[g]ait appeared to be normal."   Tr 587.   Similarly, his hearing testimony that he was

experiencing one or two panic attacks weekly contrasts with Dr. Scagnelli's notes, which reflect that by 2010 into 2011, at most visits he reported no panic attacks at all. <u>Compare</u> Tr. 41-42, <u>with</u> Tr. 563, 567, 569, 570, 571, 573, 574, 576, 577.

The ALJ's credibility assessment of Plaintiff is based on specific and adequate reasons that are clearly articulated and grounded in substantial evidence; this Court may not disturb it. <u>Frustaglia</u>, 829 F.2d at 195; <u>see</u> <u>Amaral</u>, 797 F. Supp. 2d at 161-62 (ALJ's credibility determination entitled to deference when it is based on consideration of all evidence in record and his observation and evaluation of claimant); <u>Menezes v. Apfel</u>, 2000 WL 1499491, at *12-14 (deference accorded to finding that claimant's complaints of pain lacked credibility based on evidence from physician that he was free of pain and enjoyed a full range of activities).

## VIII.   <u>Conclusion</u>

The Court finds that the ALJ's assessment of Plaintiff's functional limitations is well supported by substantial evidence and that there is no error in his decision to afford minimal weight to the box-checking assessments filled in by two of the treating physicians and to the opinion of his psychiatrist specially prepared for this application. The Court further finds that the ALJ's credibility findings are supported by adequate and specific reasons based on substantial evidence in the record. Accordingly, I recommend that Plaintiff's Motion to Reverse (ECF No. 9) be DENIED, that Defendant's Motion to Affirm (ECF No. 10) be GRANTED, and that final judgment enter in favor of Defendant.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days after the date of service. <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.

See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v.

Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
February 25, 2013